CLEMENS v. GEM FIBRE PACKAGE CO.

1. MASTER AND SERVANT—PERSONAL INJURIES—DEFECTIVE MACHINERY—EVIDENCE—SUFFICIENCY—QUESTION FOR JURY.

In an action by a servant for personal injuries, the testimony of plaintiff and his witnesses, if credited by the jury, established the fact that the stamping machine which plaintiff was operating at the time of the injury repeated and was defective, causing the injury. Defendant offered testimony tending to prove that it was mechanically impossible for the machine to repeat, and had the machine in operation before the jury and before this court. *Held*, that whether the machine was defective and repeated was a question for the jury.

2. SAME—DEFECTS IN MACHINERY—EVIDENCE—ADMISSIBILITY.

Objections to the testimony of a witness as to the condition of a machine at the time he repaired it some two months after an accident, on the ground that he first saw the machine at the time he repaired it, were properly overruled where defendant claimed that no repairs had been made subsequent to the accident which affected the operation of the machine, introduced testimony tending to prove that the parts of the mechanism complained of were quite hard and not likely to wear seriously in two or three months, and had the machine

in court and operated it before the jury, manifestly on the theory that its then condition was not materially different from that at the time of the accident.

3. EVIDENCE—EXPERTS—COMPETENCY.

Where the secretary-treasurer of defendant corporation and the superintendent of its factory testified that a certain person was employed to look after certain machines, the corporation cannot contend that that person is not qalified to testify as an expert regarding the condition and operation of the machines.

4. MASTER AND SERVANT — PERSONAL INJURIES — WARNING AND INSTRUCTING SERVANT — SUFFICIENCY OF WARNING — QUESTION FOR JURY.

Where, in an action by a servant for injuries received while operating a stamping machine, there is a conflict of testimony as to the character of the warnings and instructions given plaintiff at the time of setting him to work, and the instructions, if plaintiff's testimony is believed, were insufficient, the question is one of fact for the jury.

5. SAME—WARNINGS AND INSTRUCTIONS—NECESSITY.

Where plaintiff, an inexperienced servant, without knowledge as to the proper method of operating the stamping machine at which he was set to work, and which was alleged to have been defective, was instructed to operate it in the most dangerous way, and was hurt within a few minutes after he commenced the work, the question whether, in view of his inexperience, he was likely to appreciate the danger of following the instructions, was a question of fact for the jury; and if they determined he was not, then, regardless of the condition of the machine, the giving of instructions by the person charged with the duty of giving them to do the work in a dangerous way, when there was a safe way, was actionable negligence.

6. SAME—RISKS ASSUMED—INSUFFICIENT WARNINGS.

Where an inexperienced servant was set to operate a dangerous machine, his assumption of the ordinary risks thereof was dependent upon his being properly warned and instructed in its use.

7. SAME—DEFECTIVE MACHINERY.

Where an inexperienced servant was set to work upon a dangerous machine which was in a defective condition, he assumed only such risks as the jury find he knew of or ought to have known of and appreciated their dangerous character.

8. SAME—CONTRIBUTORY NEGLIGENCE—QUESTION FOR JURY.

Whether an inexperienced servant was guilty of contributory negligence in operating a dangerous machine in the manner in which he was instructed by the superintendent of the factory when set to work, is at most, from defendant's standpoint, a question for the jury.

9. DAMAGES—PERSONAL INJURIES—LOSS OF EARNING POWER.

Where plaintiff, suing for damages for a personal injury consisting of the loss of two fingers of his right hand, was 16 years old at the time of the injury, and was injured on the second day of his employment with defendant, the first he ever had, he had acquired no status as a wage earner, and it was not error to refuse an instruction that as a matter of law there was no evidence that plaintiff's injuries had "affected his ability to earn money."

10. SAME—INSTRUCTIONS—HARMLESS ERROR.

Where a boy of 16, suing for damages for a personal injury consisting of the loss of two fingers of the right hand, recovered a verdict of $1,500 under an instruction to award such an amount as would fairly compensate him for his injury, the amount awarded is not unreasonable aside from any loss of earning power; and if any error was committed in refusing an instruction not to include any damages for loss of earning power, such error was not prejudicial.

Error to Wayne; Hosmer, J.  Submitted June 9, 1908. (Docket No. 26.)  Decided July 1, 1908.

Case by George F. Clemens, by next friend, against the Gem Fibre Package Company for personal injuries. There was judgment for plaintiff, and defendant brings error.  Affirmed.

*Keena, Lightner & Oxtoby*, for appellant.

*George F. & Peter J. Monaghan*, for appellee.

BLAIR, J.  Plaintiff brought this action to recover damages for the loss of two fingers while operating a metal stamping press, designated in the record as a Rudolphi & Krummel press, No. 2, in forming tin boxes.  He secured

a verdict of $1,500, and defendant prosecutes this writ of error to review the judgment entered thereon.

At the time of his employment by defendant, plaintiff was 16 years old, and was the only witness of the accident. His testimony as to his employment, his work, and the accident, was as follows:

"I was first employed a day and a half before the accident. Tom Neal, the superintendent, employed me. He gave me work picking up paper off the floor, and sweeping the floor and putting it in boxes. I worked at this for one day. He then placed me in the dry room, dipping the tins. I dipped the tins into a sort of a black fluid or liquid and placed them in the oven. I worked at this about half a day. I then was engaged on a machine; the machine that caused the accident. The foreman found me in the dry room, when he got me to work on the machine. He called me and said: ' I have another position for you to fill—on a machine.' I told him I did not like to work on a machine; I did not know anything about it. And he said that he would show me how to run the machine. I did what he told me to do. I went with him to the machine; he took a piece of tin. First he told me to put my foot on the lever and have the stamp come down and to take it off and the stamp would go up and stay up; and put my foot on the lever again and have the stamp come down again; and he fed a piece of tin—fed about four or five, and about the fifth piece stuck in the machine, and he knocked it off with his finger. He told me to feed the machine and to do as he had done until he fetched me an instrument. I put in about four pieces of tin while he was there watching. After watching me do the work about two minutes, the foreman left me. He gave me no warning about the dangerous character of the machine, nor was anything said about any defects in the machine. I had never worked on any machine before. The accident happened about 10 minutes after the foreman left me.

"The accident happened in this manner: I was feeding them in the machine; feeding about four pieces and the fifth piece stuck in the machine. After I would stamp a piece of tin, I would always take my foot off the lever and put it back from the lever. After I stamped the fifth piece of tin and withdrew my foot away from the lever, knocked it off the die—it stuck—the punch came down on

my hand and came down so fast that the belt flew off and it stuck right there and my fingers in the machine. * * *

" When I was put at work on the machine, I was not instructed as to the brake. I did not know where the brake was or what it was. I knew nothing about the various parts of the machine, nor had I been instructed about the clutch or the brake or how to cure defects in them.

" On the day that I was injured, I was first put to work on another machine by Mr. Neal. That was a punching machine to stamp out the covers for the butter crocks. After working on that machine for a short time, I told Mr. Neal that I did not want to work on the machine; that it jumped. Then he took me off that machine and put me on this one. * * *

" I knew if I put my fingers in that machine and put my foot on the lever it would crush them. * * *

"*Q.* Now, you say that after you had worked on the paper machine for about half an hour then you stopped, did you?

"*A.* I stopped.

"*Q.* And what did you do?

"*A.* I told Mr. Neal I did not want to work on the machine.

"*Q.* And where was Mr. Neal at that time?

"*A.* He came around to see—he came around—I got off the machine and I went and found Mr. Neal and told him I did not want to work on the machine, that it was not in good order. The plunger came down about six times without putting my foot on the lever.

"*Q.* You told Mr. Neal all that?

"*A.* Yes, sir.

"*Q.* Now tell me the time you got hurt on this machine; do I understand that the die came down without your having your foot around the treadle?

"*A.* On which machine—on that machine?

"*Q.* Yes.

"*A.* The die came down without my foot on the lever.

"*Q.* And the die came down. I think you were telling us that you got a piece of tin, or whatever they were, and one of the pieces of tin had rested on the die and you struck it off?

"*A.* I knocked it off with my fingers.

"*Q.* Knocked it off with your fingers?

"*A.* And just as I was under knocking it down the

plunger came down. * * * It had gone right up and came right down again without my foot on the lever— came down unexpectedly I will tell you. * * *

"*Q.* And you took your fingers to get it off ?

"*A.* I took my fingers to knock it off just as Mr. Neal done when he was running the machine."

Defendant's superintendent, Neal, who had charge of the presses when plaintiff was hurt, testified :

"I recollect plaintiff coming for work, and of his being placed upon a paper stamping machine. That was the day before he was injured. I took him to Charles Dewstow and he instructed him as to running the machine. He worked nearly a day on the paper press—I would not be sure, but he worked a great part of the day before he was injured. He was transferred onto the tin press because work enough had been done on the paper press to last us awhile and he was taken off that work. If I remember right, he was taken off the paper press and put in the lacquer room by myself and from there to the tin room. Mr. Clemens at no time, while he was working on the paper press or later, complained to me about the paper press jumping, or his not wanting to work on it because of danger. I never heard of that before. I put plaintiff to work on this particular press I would say it was less than half an hour before he was injured. The operation of the paper press and of this press is similar. They both work by treadle. I took plaintiff over to the press and started to operate it and I was very particular to tell him to be sure and take his foot off the pedal while feeding it, and I ran it a little while and showed him just how to do it, and then he went to work at it and I stood and watched him. I watched him until I felt that he understood it and then I left. I think I operated it myself anyway 5 minutes and I suppose that I stayed there for 5 or 10 minutes while he operated it. I struck off probably 50 can tops there. The press worked all right; it worked perfectly. It did not repeat at all during that time. If the press at that time had shown any weakness or defect in its operation or otherwise, I would have stopped the machine and examined it and looked at the defective part. It would be my duty to attend to the press, if there were any such thing the matter. The press is geared up to run about 125 strokes a minute. * * *

"If a piece of tin had stayed on the die and the opera-

tor had wanted to get it off, there were plenty of tins around there that could be used to get it off with. I told plaintiff to do it in that way. I told him to take it off with the tins. I did not say anything about providing him with anything else. It would be just as easy to take it off with the tins as with the fingers."

The Rudolphi & Krummel press works as follows: By pressure upon the foot treadle, the clutch fork is pulled down, allowing the clutch pin to be thrown by a spring so that the pin engages the wheel which carries the power. The wheel is constantly revolving while the engine is going and the belt is on the pulley. When, by pressing on the foot treadle, the clutch pin is made to engage with the wheel, the shaft revolves, and by eccentric action, the stamp or plunger is forced down, the dies meet and perform their work and the stamp or plunger is brought up to its former position. This action necessarily occurs with each revolution of the shaft. If the foot treadle is held down, this action continues. Upon removal of pressure from the foot treadle, the clutch pin releases the wheel and the shaft carrying the stamp or plunger stops after the first revolution. A friction brake applied to the shaft by a small hand wheel regulates to some extent the action of the shaft. On the Rudolphi & Krummel press, a safety pin is provided which is designed to prevent the machine, even when the friction brake is entirely removed from contact with the shaft, from revolving more than once unless the foot treadle is kept down.

Defendant's counsel distribute their argument under five principal heads. We shall consider the points made somewhat out of their order as presented by the brief.

2. The record does not show that plaintiff's injuries were due to any negligence on the part of the defendant. As stated by defendant's counsel:

" The circuit judge submitted the question of defendant's negligence to the jury, upon two items:

"*First.* Whether the defendant failed to give plaintiff proper instruction, and,

"*Second.* Whether the press was defective. The other

allegations of negligence were not proven, or, at all events, the circuit judge so decided.

"The defendant's claim on this branch of the case is:

"(a) That there was no proper evidence submitted on the trial tending to prove any defect in the press.

"(b) That plaintiff had sufficient warning and knowledge of the danger connected with using the press, and that therefore defendant was not negligent in this respect; and finally

"(c) That the court erred in not eliminating from the consideration of the jury the other alleged grounds of negligence, which were set forth in the declaration, but were not proven."

The witness Jolly testified that prior to the plaintiff's injury: .

"I told Tom Neal, the foreman, that the brake worked loose, and he told me to tighten it up. I don't know exactly how many times I told him, but I think it was more than once. I have tightened the brake myself without notifying him. * * *

"Q. Now, did it, while working with you, remain up when you took your foot from the lever?

"A. Well, it came down a couple of times when I was not expecting it; but then I did not pay any attention to it. * * * The only thing that I told Mr. Neal was that the brake was loose; sometimes he would come over and tighten it, or he told me to tighten it, and it was all right after I tightened it. * * * An experienced man could tell of the looseness of the brake by the sound of the press. A new hand would not be able to tell.

Samuel Keys testified:

"I noticed that the brake occasionally worked loose.

"Q. And what was the effect upon the machine when the brake worked loose?

"A. Well, put your foot upon the lever and it would come loose, and if the brake was very loose, it would go up and trip and come right over and come down again; repeat. * * * If the brake was very loose, when you put your foot on the lever it would come down and would go up again and trip and come right over and down again; that is, repeat. When this would occur, the person who is at work on the press generally fixed it if they were experienced enough to know. Sometimes I did it if I no-

ticed it; sometimes Mr. Neal would do it. He generally saw it himself when I first started on the press, but after I got used to it, if I noticed it myself, why, I tightened it up. * * * I ran the machine the evening after the plaintiff was injured and it tripped perfectly; I told Mr. Harbeck that, and that is the truth.

"*Q.* And you told him the machine was not changed or fixed between the time of the accident and when I was working on it after supper, did you tell him that?

"*A.* To my best knowledge.

"*Q.* To your best knowledge, you told him—you were telling him your best knowledge?

"*A.* Yes, sir. * * * I saw this machine repeat when I was on the machine. It repeated with me after I was an experienced hand. So far as I was concerned, there was no warning given by the machine before it repeated. I cannot say how many times or how long before the accident it repeated. I have seen the machine come down several times with others and when it repeated for me, I had my foot off the lever."

Edward Mohr testified that he lost two fingers on this same machine a week or two before plaintiff's injury:

"I was hurt by the brake being loose and the machine repeating. All the time the machine repeated, I did not have my foot on the lever. * * * I put a piece of tin under the die and bumped it and it went up, and when I went to put another piece, when I was putting the other piece on, the die came down on my fingers and a piece was under my fingers yet. I had not put my foot on the lever to make it come down the second time. I put my foot on the lever and it came down, and just as I was putting a piece of tin in the die, it came down again without my putting my foot upon the lever."

Mr. Neal testified for defendant:

"I heard the testimony of Mr. Jolly. He told me once that the press repeated. I examined the machine and tried it and could not—I never saw it repeat. Mr. Jolly was working on the machine at the time and he came to me, as foreman, and told me the machine repeated and I went over and tried it and found that it did not repeat. * * *

"*Q.* In testing this machine, or operating this machine

after Mr. Jolly reported to you that it wouldn't work right and that it repeated, what did you do?

"*A.* Tripped the machine.   *   *   *

"*Q.* Just put your foot on the lever and kept on doing that a few times to see whether it repeated or not with you?

"*A.* Yes, sir.

"*Q.* That is all you did?

"*A.* Yes, sir."

Hugo Gressman testified for plaintiff:

"I am experienced in machinery for stamping sheet metal and have been engaged in that kind of work off and on for 12 or 13 years. I began working for the Gem Fibre Package Company, the defendant, I think it was in August, 1904. I was hired to set dies and take care of presses. The press in court came under my line of work. I found defects in that machine which I repaired.

"*Q.* Tell what those defects were which you repaired a year ago last August?

"*A.* I came into the factory and the first thing I did I looked over the machines; I looked at them and tried them and I saw that some of the parts were worn. And I tried the slides first. I found the slides worn slightly and loose.   *   *   *   The first thing I did was to adjust the slides, and it ran along, I think, for a day or two and there was something defective in the clutch—I noticed that.   *   *   *   I took the wheel off and examined it and I found the edges of the pin were worn off round.

"*Q.* Did you repair that?

"*A.* Yes, sir.

"*Q.* Did you see if the brake was properly tightened?

"*A.* Well, I found out in a day or two that it worked loose. I did not know it at the time, just the same day I started to work, I didn't find that out; I found out little by little. I had never seen a machine of that manufacture before until I came to work for them.   *   *   *   I am not exactly a machinist.   *   *   *   My chief work was changing the dies and getting the machine ready for work. I had done that work in other shops. After I became employed there, I had this machine apart several times. I had the pin out. I ground off the face of it to square it, so that it did not have so much chance to slip out.   *   *   *   I did not put in a new pin. So far as I know, the same pin is now in the machine that has always been there; I

ground the pin off which would make the edges a little sharper. That would make the pin remain there more certainly when it became engaged. If the pin came out, the machine would stop. If the pin did not engage, the machine would not work. If the clutch lets go entirely, it can't repeat, but if the clutch may remain half way in, it would cause it to. *   *   *

"Q. Is that the dog that shoves up there in front of the hole there; did you ever tinker with that dog?

"A. Yes, I think I did grind off that place in there and made a point on it, or put a point on it by grinding this beveled side.

"Q. How much did you grind?

"A. Oh, perhaps, well, not an eighth of an inch. * * *

"Q. Were the conditions which you found in the machine at the time of your repairing it, such as might cause this repetition that is complained of in this case?

"A. Yes, sir. *   *   *

"Q. Well, if the dog was worn away, then it would repeat eternally, wouldn't it?

"A. Not necessarily.

"Q. Why not?

"A. Because it would not always strike the same way. There might be a little defect in there that would not cause a continuous defect in the machine; it may work this time and the next time you put your foot on it may not work.

"Q. Now, is that the only thing that you repaired that would be likely to cause a repeating?

"A. Yes, sir."

Neal testified:

"I remember witness Gressman saying he ground the clutch pin on this machine which was all right; I think he did. That was about two months after the accident; . * * * I have been in charge of the machines at the factory since this press was purchased and put in place, although the presses have not been directly under me of late. There is more work now and I have more help and at the present time other men look after the machines under my directions. Back of that time, I did it myself. Mr. Gressman was employed to relieve me of what I had done previously."

Mr. Harbeck, secretary and treasurer of defendant, testified:

"I can't say whether Mr. Gressman repaired this particular machine. I presume that he did. That is what we had him for; but the nature of the repairs had nothing to do with the repeating of the press."

Defendant's testimony tended to show that the mechanical construction of the machine was such that it was impossible for it to repeat.

"On the Rudolphi & Krummel presses and on this particular press, there is an appliance which is designed to and which does prevent a repeating of the machine, whether the friction brake is on or not. It is a pin right above the fork. That pin is put on there in case the brake would be loose—slides loose or anything, and you have got a die in there, possibly with a big rubber where there is considerable rebound—if your brake is loose— slides loose that throws it around as quick as that pin was out, the rebound of the rubber bringing it up the slide would throw that over center, and if it does this, with this pin in there, this pin will strike the fork and that pin has either got to break or the fork has got to break to let it pass over, provided the thing is in shape, without there is something broke off of it before. That pin is on this machine, and in my experience it works in the way that I have described. I have never known it to fail."

*a.* The testimony of plaintiff and his witnesses, if credited by the jury, established the fact that the machine repeated and was defective, unless we must hold that the jury were bound to find that it was mechanically impossible for the machine to repeat, under the testimony, and that the witnesses to that effect either committed perjury or were certainly mistaken as to the fact. Notwithstanding the persuasive argument of the able counsel for defendant, illustrated by the operation of the machine in question in our presence, we think it would have been improper for the trial judge and equally improper for us, upon the basis of our judgment as to mechanical possibilities, to invade the province of the jury and determine as a matter of law that there was no question of fact for their consideration. *Dupuis* v. *Traction Co.*, 146 Mich. 151.

By assignments of error 1st, 16th and 17th, defendant's counsel sought to have the court exclude from the jury as bearing upon the question of defendant's negligence, any testimony of Gressman, *first*, because he never saw the machine until some two months after the accident; and, *second*, because he was not an expert. Prior to the testimony of Gressman, the following colloquy occurred between counsel:

" *Mr. Monaghan:* Is it your contention that this machine was not repaired from the time that that accident happened up to the present time?

" *Mr. Lightner:* My contention is that if there were any changes of any kind, they were not with regard to the operating of the machine.

" *Mr. Monaghan:* Were not regarding any part which concerned the operation?

" *Mr. Lightner:* Which affects the operation of the machine.

" *Mr. Monaghan:* Either the clutch or the dog or anything else?

" *Mr. Lightner:* Yes."

There was no evidence of any repairs made after the accident by anyone but Gressman, and defendant had the machine in court and had it operated in the presence of the jury, manifestly on the theory that its then condition was not materially different from that at the time of the accident. The testimony of defendant's expert, Wood, indicated that the parts of the clutch mechanism were quite hard and not likely to wear seriously in two or three months. Under such circumstances and the concession of counsel, the court did not err in admitting the testimony of Gressman as to the condition of the mechanism. *Fuller* v. *Mayor, etc., of Jackson*, 92 Mich. 197.

The testimony of Mr. Harbeck and Mr. Neal, previously quoted, is a sufficient answer to the contention that Gressman was not qualified to testify as an expert.

*b.* Plaintiff's testimony, if believed by the jury, would warrant a finding not only that he was given no instructions about the brake or its liability to become loose and

the necessity for tightening it; or as to the promptness with which he should remove his foot from the treadle; or as to the reports that the machine had repeated and the necessity for removing the work with a tin and not with his fingers; but that, on the contrary, he was instructed that when he took his foot off the treadle "the stamp would go up and stay up," and to remove the tins with his fingers, "just as Mr. Neal done when he was running the machine." There was a conflict of testimony as to the instructions given and the court did not err in submitting the question to the jury.

Under this subdivision of the brief for defendant, it is said:

"By the defendant's 9th request, it asked the court to advise the jury that if the press was all right, their verdict would have to be for the defendant; also, that if the press was all right, and had been properly inspected, a verdict should be rendered for defendant, even if, as a matter of fact, the machine did repeat.

"The court modified these and other requests, by adding that they would not apply if the plaintiff had not received sufficient instruction or warning, and the court emphasized the error which we are now considering, by instructing the jury that they were to consider whether the proximate cause of the injury was the failure to give plaintiff instruction; and again, whether the proximate cause of the accident was the failure of plaintiff to appreciate the danger incident to handling the machine."

In considering the propriety of the modifications of the instructions, the inexperience of the plaintiff and all of the surrounding circumstances must be borne in mind. The mere fact that he knew that if his hand was under the die when he put his foot upon the treadle it would be crushed was not sufficient to relieve the defendant. *Allen* v. *Jakel*, 115 Mich. 484.

There was a safe way of using the machine, which Neal testified he directed plaintiff to follow, and the following of which would have prevented any injury. Plaintiff testified that Neal knocked the tin off with his fingers and in-

structed him to do the same way till he brought him an instrument. Plaintiff had worked for a short time on the paper machine and had been relieved at his own request because it repeated and was then put at work upon the machine in question, which Neal told him would not repeat if his foot was taken off the treadle. He knew nothing about the machine except the feeding of the tin and was instructed to feed the tin in the most dangerous way and was hurt within a few minutes after he commenced the work.

Whether, in view of plaintiff's inexperience, he was likely to appreciate the danger of following the instructions given him, was a question of fact for the jury, and if they determined that he was not, then, regardless of the condition of the machine, the giving of instructions by the person charged with the duty of giving them to do the work in a dangerous way when there was a safe way was actionable negligence. *Kolodziejski* v. *Seestadt,* 143 Mich. 38.

*c.* The other allegations of negligence were sufficiently eliminated by the charge of the court confining the jury to the consideration of the two submitted. We do not think there was any prejudicial error, if any at all, in refusing the request.

3. Assumed risk and errors in the record upon this proposition. The court instructed the jury upon this subject as follows:

" I am asked to charge you, if you find that the press machine was in good condition and that there were none of the defects in it as claimed by the plaintiff, your verdict will be for the defendant, because the plaintiff assumed the ordinary risk attendant on the ordinary operation of the machine. I think that is so, gentlemen of the jury, but at the same time I qualify it only, as I said before, by saying to you that, if he had not sufficient appreciation of the danger or sufficient instructions to warn him in that regard, why, under those circumstances, you may find that that was the proximate cause of the injury. But it presents, as I said before, wholly a question for the jury and not a question for the court."

We think it clear that the court would not have been justified in directing a verdict for the defendant on the ground that if the machine was in proper condition plaintiff assumed all of the ordinary risks, since his assumption of the ordinary risks would depend upon the finding of the jury as to the instructions given to him. If the machine was not in proper condition, plaintiff would only assume such risks as the jury should find he knew of or ought to have known of and appreciated their dangerous character. Our previous discussion obviates any further consideration of this head.

4. Plaintiff was guilty of contributory negligence. The question of plaintiff's contributory negligence was, under the alleged instructions, at most, a question for the jury.

5. Error relating to measure of damages. The assignment under this head is based upon the refusal to give the defendant's 17th request to charge, as follows:

"17. If you consider the question of damages, you will not include in your verdict any amount for loss of earning power, because it does not appear that plaintiff's injuries have affected his ability to earn money."

We do not think that the judge erred in refusing to instruct the jury that as a matter of law the loss of two fingers of the right hand was no evidence that plaintiff's injuries had "affected his ability to earn money." The only testimony on the subject of damages, aside from that relating to the accident, was that of the plaintiff, who testified:

"After the accident, I was taken to the sanitarium and suffered great pain, which continued for about a month. I am troubled with pain in that hand at the present time, if I write too long, say half an hour, and on cold days the fingers feel numb. They have no feeling in them at all.

"The plaintiff showed the right hand to the jury, from which it appeared that the first and part of the second joint of the first and second fingers had been entirely cut off. * * *

" I am in the tenth grade at the Western High School. I have been there two years, I guess.  This accident happened during vacation, and I entered the high school the next fall."

So far as the record discloses, the employment by defendant was the only employment the boy had ever had. His business was attending school, to acquire an education preparatory to future employment; he had acquired no status as a wage earner; and the case is to be distinguished from cases where evidence can be given of actual earning capacity and its subsequent diminution.  See *Black* v. *Railroad Co.*, 146 Mich. 568.

The defendant's 16th request to charge was as follows:

"If you consider the question of damages, you will award to plaintiff such an amount as will fairly compensate him for the injuries resulting from the accident."

The trial judge gave the substance of this request and nothing else upon the subject of damages.  The jury were not instructed that they might consider the question of loss of earning power or that such loss was an element of the damages to be awarded, but simply to award to the plaintiff "such damages as he suffered by reason of the injury."  The amount awarded by the jury is not an unreasonable compensation for plaintiff's injuries, aside from any loss of earning power; the instruction as to the damages recoverable was substantially as requested by defendant, and if the court erred in refusing the 17th request, we think such error was not prejudicial.

We are of the opinion that the case was fairly submitted to the jury and that the assignments of error are not well founded.

The judgment is affirmed.

GRANT, C. J., and MOORE, CARPENTER, and MC-ALVAY, JJ., concurred.